

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

**IN THE UNITED STATES DISTRICT COURT**   2012 JUN 25   AM 11: 13
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**   CLERK OF COURT

| | | |
|---|---|---|
| SHOW, INC.,<br>CONTENDER FARMS, L.L.P. and<br>MIKE MCGARTLAND<br> Plaintiffs | §<br>§<br>§<br>§<br>§<br>§ | |
| v. | §<br>§ | **4-12CV-429-Y**<br><br>CIVIL ACTION NO. _____ |
| UNITED STATES DEPARTMENT<br>OF AGRICULTURE<br><br> Defendant | §<br>§<br>§<br>§<br>§ | |

## PLAINTIFFS' COMPLAINT
## AND APPLICATION FOR INJUNCTIVE RELIEF
## WITH BRIEF IN SUPPORT

This is a suit to enjoin a new rule by the Department of Agriculture from taking

effect on July 9, 2012. Under the new rule, the Department is attempting to force private

entities to impose mandatory suspension penalties on participants in horse shows for

violations of federal law and to mandate that the entities provide a Department approved

and monitored system for appeals by those individuals so penalized. The rule violates the

Horse Protection Act, 15 U.S.C. §1821, *et seq.*, the Administrative Procedures Act, 5

U.S.C. §706, and the United States Constitution. Plaintiffs will suffer immediate and

irreparable harm if the rule is allowed to become effective. Plaintiffs, by counsel and

pursuant to the Federal Rules of Civil Procedure, assert the following.

1

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................6

II.     PARTIES ...............................................................................................8

III.    JURISDICTION AND VENUE  ...........................................................9

IV.     STATEMENT OF FACTS ......................................................................9

    A.      ORIGINS AND PURPOSES OF THE HPA ...........................................9

    B.      THE HORSE PROTECTION ACT ....................................................10

    C.      CURRENT DEPARTMENT REGULATIONS .......................................13

    D.      THE NEW RULE, 9 CFR §11.25 ..................................................15

    E.      BACKGROUND ON HIO ENFORCEMENT .......................................16

    F.      THE 2010 OIG AUDIT REPORT ...................................................17

    G.      THE 2010 AND 2012 ECONOMIC ANALYSIS REPORTS ..................20

V.      STANDARD OF JUDICIAL REVIEW OF DEPARTMENT ACTIONS  ..............21

VI.     LEGAL GROUNDS FOR RELIEF  ...................................................22

    A.      THE USDA'S CREATION OF PRIVATE TRIBUNALS TO ADJUDICATE AND
        ENFORCE FEDERAL LAW CONTRAVENES THE CONSTITUTION ARTICLE I,
        SECTIONS 1 AND 8 AND ARTICLE III, SECTIONS 1 AND 2 ....................................22

    B.      THE NEW RULE VIOLATES THE ADMINISTRATION PROCEDURES ACT AND
        THE CONSTITUTION BY CREATING ADJUDICATORY TRIBUNALS IN PRIVATE
        ENTITIES AND UNLAWFULLY DELEGATING TO THEM ENFORCEMENT POWER
        UNDER FEDERAL LAW. ....................................................................24

    C.      THE NEW RULE'S MANDATORY MINIMUM  SUSPENSION PENALTIES,
        IMPOSING SUSPENSIONS  FROM ALL SHOWS, IS NOT IN ACCORDANCE WITH
        THE HPA, AND IS IN EXCESS OF THE USDA'S STATUTORY AUTHORITY UNDER
        THE HPA ......................................................................................26

    D.      THE NEW RULE DENIES PARTICIPANTS CONSTITUTIONAL AND STATUTORY
        DUE PROCESS, CONTRAVENING APA §706(B) ...............................31

    E.      BECAUSE THE ADMINISTRATIVE RECORD DOES NOT SUPPORT THE NEW RULE
        IT IS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION IN VIOLATION
        OF APA §706(A) .........................................................................33

1.  The requirement that HIOs complete appeals within 60 days is arbitrary, capricious and not supported by the administrative record ...................................... 34

2.  The Department's conclusion that the new rule will not increase costs to HIOs is arbitrary and an abuse of discretion, violating APA§706(a)...................... 41

F.  THE NEW RULE IS ARBITRARY AND CAPRICIOUS BECAUSE IT EXPOSES DQPS, HIOS AND THEIR AGENTS TO CIVIL LIABILITY WITHOUT PROVIDING THEM GOVERNMENTAL OR OFFICIAL IMMUNITY ...........................................49

G.  THE NEW RULE WILL FRUSTRATE THE GOAL OF THE HPA, CONTRAVENING APA§706(A)...............................................................................................50

VII.   RELIEF REQUESTED ...........................................................................52

A.  REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ............................................................................................52

B.  PERMANENT INJUNCTION AND DECLARATORY RELIEF ....................................55

VIII.   CONCLUSION ....................................................................................55

## TABLE OF AUTHORITIES

<u>**Cases:**</u>

*Burlington Truck Lines Inc. v. United States,* 371 U.S. 156 (1962) ..................................35

*Caperton v. A.T. Massey Coal Co. Inc.,* 129 S.Ct. 225 (2009) ..........................................31

*Cary  v. Curtis,* 44 U.S. 236 (1845) ..................................................................................24

*Chevron v. Natural Resources Def. Council* 467 U.S. 837 (1984) .....................................21

*Clinton v. City of New York,* 524 U.S. 417 (1998) .............................................................30

*Fleming v. USDA*, 713 F.3d 179 (6th Cir. 1983) ...............................................................49

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.,* 130 S.Ct. 3138 (2010) .........26


*Harlan Land Co. v. USDA*, 186 F. Supp.2d 1076 (E.D. Cal. 2001) ............................34, 35

*INS v. Chadha,* 462 U.S. 919 (1983) .................................................................................30

*Medina County Envtl. Action Assoc. v. Surface Transp. Bd.,*

602 F.3d 687 (5th Cir. 2010) .........................................................................................37

*Northern Pipeline Construction v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982) ...........24

*Ranchers Cattleman Action v. USDA*, 415 F.3d 1078, 1093 (9th Cir. 2005) ...................34

*Richardson v. McKnight,* 521 U.S. 399 (1997) ..................................................................50

*R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Administration,*

823 F.Supp.2d 36 (D.D.C. 2011)...............................................................................53, 54

*Shook v. Dist. of  Col. Fin. Resp Man. Auth.,* 132 F. 3d. 775 (D.C. Cir. 1988) ...............26

*United States v. Giordano,* 416 U.S. 505 (1974) ...............................................................25

*Univ. of Tenn. v. Elliot,* 478 U.S. 788 (1986) ...................................................................33

<u>**Constitution, Statutes and Regulations:**</u>

U.S. Constitution, articles I and III ........................................................................ *passim*

Administrative Procedures Act, 5 U.S.C. §706 .......................................................... *passim*

Horse Protection Act, 15 U.S.C. §1821, *et seq.*......................................................... *passim*

28 U.S.C. § 1331 .................................................................................................................9

28 U.S.C. § 1346 .................................................................................................................9

28 U.S.C. § 1391 .................................................................................................................9

28 U.S.C. § 2201 .................................................................................................................9

28 U.S.C. § 2002 .................................................................................................................9

9 C.F.R. § 11(2011) .................................................................................... *passim*

# I. **INTRODUCTION**[1]

1.     The USDA's new rule will regulate the Tennessee walking horse industry, and hundreds of shows and competitions held each year throughout the nation. Tennessee walking horses have a distinctive gait, notable for the high step of the horses' front legs. This high step can be achieved by breeding, training and practice. It can also be achieved by cheating. Cheaters sore the front legs of the horse, which makes the horse exaggerate its gait because it hurts to touch the ground. Horses with superior gaits win competitions and are highly valued. Cheating is not only cruel to the horse, it results in a fraud on participants and has a negative impact on the breed and the industry.[2]

2.     In 1976, Congress enacted the current version of the Horse Protection Act (HPA), which prohibits showing, selling or transporting "sored" horses. Under the Act, managers of walking horse events must disqualify sore horses to avoid civil or criminal liability under the HPA.[3] Managers are strictly liable under the HPA if any sore horse participates, unless management employs a person qualified to detect a sore horse and management disqualifies horses that person identifies as sore. Regulation and enforcement under the HPA rests with the USDA and the Animal and Plant Health Inspection Service (APHIS). Per the regulations enacted under the HPA, Horse Industry Organizations (HIOs) are certified by the USDA to train and license private inspectors, or Designated Qualified Persons (DQPs). DQPs can be hired by show managers to inspect all horse entries and identify sored horses for management. Management can disqualify the horse from that

---

[1] In support of their application for a temporary restraining order and preliminary injunction, plaintiffs have submitted eight volumes of Plaintiffs' Appendix of Evidence containing the declaration of plaintiff Mike McGartland and the 82 exhibits supporting that declaration. References to the evidence are to the exhibit by number, then to the appendix volume number, and page and to a paragraph if appropriate. The abbreviate reference format is "Ex. __ , __ Apx. __ , ¶ __. The exhibits are highlighted, except for Exhibit A, where the paragraphs are identified.
[2] Ex.A, 1Apx.3-4, ¶ 7-8; Ex.29, 4Apx.526.
[3] Ex.A, 1Apx.3-4, ¶ 9; Ex.29, 4Apx.532.

6

show, thus protecting a manager from liability.[4] If a DQP fails to disqualify a horse later found to be sore, management is not liable for violating the HPA. To deter participants from the practice of soring, HIOs have rulebook penalties they impose on people whose horses are identified as sore, and they have informal appeal systems if an individual challenges the HIO's assessed penalty. The entrants agree to abide by the HIO's penalty matrix and appeal procedure when they sign the entry form.

3.      The USDA, on June 7, 2012, announced its adoption of a new final rule, effective July 9, 2012, which requires HIOs to assess USDA prescribed mandatory suspension penalties on people — entrants, trainers and owners — who are found by an HIO's DQP to have sored a horse. The new mandatory minimum suspension penalties disqualify an accused violator from participating in any and all horse shows anywhere in the nation. The new rule also requires HIOs formulate and adopt an appeal process that must be approved by the USDA.[5] The new rule does not contain any appeal procedures, and the USDA will not approve an HIO's proposed procedures unless: (a) they "ensure the persons who have penalties assessed by an HIO will have recourse within the HIO structure [that] fulfills the due process requirements of the Act" and (b) require the HIO to initiate prosecutions and complete the appeal within 60 days of the event giving rise to the offense.[6] The new rule provides that if the HIO appeal is not completed within 60 days, the accused must nonetheless begin serving the suspension 60 days after the issuance of the ticket. There is no provision for judicial or administrative review. A suspension penalty imposed by an HIO does not prevent the USDA from pursuing

---

[4] Ex.A, 1Apx.1-2, ¶ 4-5.
[5] Ex.A, 1Apx.2, ¶ 5.
[6] Ex.A, 1Apx.22, ¶ 61; Ex.2, 2Apx.171.

criminal or civil actions under the HPA based on the same allegations.[7]

4.      The USDA's rule, compelling private entities to adjudicate whether a person is responsible for violating the HPA, and dictating the penalties to be imposed, without the right to agency and judicial review, contravenes not only HPA §1825(b) and (c), it contravenes the very structure of the United States Constitution. Congress did not create the HIOs as inferior courts to enforce federal law, and the USDA's attempt to use an administrative rule to create private tribunals to enforce federal law violates the Constitution's separation of powers doctrine by unlawfully delegating adjudicative and enforcement powers to private entities.   The new rule violates the Administrative Procedures Act, 5 U.S.C. §706(2)(A)-(D), because it is arbitrary, capricious, not in accordance with the law, is contrary to constitutional rights and powers, exceeds the USDA's authority under the HPA, and has been adopted without observance to the procedures required by law.  Plaintiffs seek a declaratory judgment of the rule's invalidity and ask this court to enjoin the USDA from enforcing the new rule.

## II. **PARTIES**

5.      Plaintiff SHOW, Inc. is a Tennessee not-for-profit corporation headquartered in Shelbyville, Tennessee.   Since 2009 it has been a USDA certified Horse Industry Organization that licenses Designated Qualified Persons (DQPs) who perform horse inspections at the request of managers of Tennessee walking horse shows and exhibits.[8]

6.      Plaintiff Contender Farms, L.L.P. is a Mississippi Limited Liability Partnership that owns, trains, shows and sells show horses.

---

[7] Ex.A, 1Apx.9, ¶ 27; Ex.1, 1Apx.54-55.
[8] Ex.A, 1Apx.1, ¶ 3.

7.      Plaintiff Mike McGartland, a resident of Tarrant County, Texas, is an owner of and general partner in Contender Farms, L.L.P.  He owns and exhibits show horses, hires trainers, and suffers the losses or benefits from the profits of Contender Farms, L.L.P.  In addition, Mr. McGartland, an attorney, is a volunteer prosecutor for SHOW, Inc. in cases where a ticket is issued to an owner, contestant or trainer and that  person appeals the ticket to a panel of judges appointed by SHOW.[9]

8.      Defendant United States Department of Agriculture (USDA) is the United States' Department administering the Horse Protection Act and its rules and regulations through its branch, the Animal and Plant Health Service (APHIS).[10]

### III.  JURISDICTION AND VENUE

9.The district courts of the United States are vested with jurisdiction over cases arising under the Horse Protection Act. 15 U.S.C. §1825(d)(6).  Per the rule at issue and the HPA, no administrative remedies need be sought before suit can be brought in this court. This case is based on 28 U.S.C. §§ 1331, 1346, 2201, and 2002. Venue is proper under 28 U.S.C. § 1391 in the Northern District of Texas, Fort Worth Division, because Plaintiff McGartland resides in Tarrant County, Texas.

### IV. STATEMENT OF FACTS

**A.      ORIGINS AND PURPOSES OF THE HPA**

10.    The 1970 House Report 91-1597 describes the problem to be addressed:   The Tennessee walking horse is "distinguished by its proud, high skipping gait or 'walk.'" "The Horse's distinctive 'walk' may be achieved through patient, careful training and is the result of both the trainers' skill and the horse's natural breeding."  However, the walk

---

[9] Ex.A, 1Apx.1, ¶ 6-7.
[10] Ex.A, 1Apx.1-2, ¶ 4.

"can also be created artificially" by cheating. The 1970 HPA made it unlawful to show or exhibit sored horses, providing a criminal penalty for willful violations, and a civil penalty up to a $1,000 fine for non-willful violations and $2,000 for willful violations.[11]

11.     In 1976 the HPA was amended because of the deficiencies summarized in House Rept. No. 97-1174. After 1970, the Department did not hire additional employees to enforce the HPA. The central USDA office in 1975 had one fulltime employee administering the Act and two and a third regional employees—3.3 employees to cover the entire nation and over a thousand events a year. The USDA testified that "despite the fact that horse industry organizations cooperated and worked with the USDA to eliminate much of the practice of soring through internal self-policing efforts, increased Federal enforcement was necessary...." As a result, there were numerous changes in 1976.[12]

12.     Relevant here, the amendment included (a) the provision for appointment of non-governmental inspectors who show managers could hire, thus avoiding liability if sore horses were exhibited, (b) a provision whereby the Secretary could disqualify people from events for a mandatory time period for HPA violations, and (c) it gave the Department subpoena and deposition authority it had identified as necessary to conduct fair hearings. The amendment authorized the Secretary to prescribe, by rules and regulations, requirements for the appointment by management of horse shows and exhibitions of persons qualified to detect and diagnose a sore horse and to conduct inspections for the purpose of eliminating sore horses from competition.[13]

## B.     THE HORSE PROTECTION ACT

13.     The HPA, 15 USC §1823, sets forth how horses are to be protected. Section (a)

---

[11] Ex.A, 1Apx.3, ¶ 7-8.
[12] Ex.A, 1Apx. 3-4, ¶ 9; Ex.29, 4Apx.532b.
[13] Ex.A, 1Apx.4, ¶ 9; Ex.29, 4Apx.532a-b.

requires that management of horse shows "shall disqualify any horse from being shown or exhibited (1) which is sore or (2) if management has been notified by a person appointed in accordance with regulations . . . or by the Secretary that the horse is sore." Section (c) requires the Secretary to prescribe regulations "for the appointment by management" of a person qualified to diagnose, detect, and "inspect horses for the purposes of enforcing this chapter" and that person must conduct inspections only in the manner prescribed by the Secretary.[14]

14.     The HPA puts the burden on an event's management to prevent the exhibition of sore horses. But the duty and power of management extends only to the disqualification of a horse, not the disqualification of owners, trainers, or exhibitors. Only management of the show, not the HIOs (which are not mentioned in the Act, only in the regulations) or their licensed DQPs, has the duty and right to disqualify a sore horse from the event in which the horse is entered. The Act does not authorize or require management to disqualify the allegedly sore horse, the trainer or the owner from other shows or events.[15]

15.     Section 1824 prescribes the unlawful acts. Subsection (2) prohibits (A) showing or exhibiting a sore horse in a horse show; (B) entering a sore horse;  (C) selling a sore horse; and (D) "allowing any activity described in (A), (B), or (C)." This section applies to owners, trainers, and riders. Subsection (3) prohibits management from failing to disqualify a sore horse, unless management appoints and retains a person as provided by §1823 (c).  Management is strictly liable for permitting a sore horse to be shown, unless it retains a DQP and disqualifies a sore horse after being notified by the DQP that the horse is sore.[16]

---

[14] Ex.A, 1Apx.4, ¶ 10; Ex.2, 1Apx.59-60.
[15] Ex.A, 1Apx.4, ¶ 11.
[16] Ex.A, 1Apx.4-5; Ex.2, 1Apx.61-62.

16.    Section 1825 prescribes the penalties for violating §1824.  Only the Attorney General can enforce section §1824(a), criminal acts and penalties, and only for willful violations. Section 1824(b) provides for civil monetary penalties for a violation of §1824, of not more than $2,000 for each violation. The HPA sets forth the statutory due process rights guaranteed to the accused.  A penalty can be assessed by the Secretary but only after notice, a hearing before the Secretary, a written order by the Secretary, and only after the Secretary has taken into account, in arriving at the amount of the penalty, factors such as the nature of the offense, culpability, gravity, prior offenses, ability to pay, effect on the business "and such other matters as justice may require." Further, "[t]he Secretary may, in his discretion, compromise, modify, or remit, with or without conditions, any civil penalty assessed under this subsection."  The Secretary's final order is subject to review in the court of appeals under the Administrative Procedures Act (APA).[17]

17.    Section 1825(c) permits the Secretary to disqualify a person from showing horses, transporting horses, and judging or managing shows or auctions. The penalty of disqualification is "in addition to" the criminal and civil penalties in subsections 1825(a) and (b). Disqualification from participation in events can only be assessed against a "person who was convicted under subsection (a) of this section or who paid a civil penalty under subsection (b)" or where there is a final order assessing a civil penalty under (b) that has not been paid.  If that precondition to a disqualification under (c) is met, the Secretary additionally may order the person disqualified from exhibiting, judging, etc., but only after notice and the opportunity for a hearing before the Secretary. Three provisions of subsection (b) apply to disqualification proceedings, including that the Secretary shall take into account (1) such mitigating factors as justice may require, (2)

---

[17] Ex.A, 1Apx.5, ¶ 13; Ex.2, 1Apx.63-64.

the Secretary may exercise his discretion to remit or probate the penalty of disqualification and (3) the person found to be in violation in a final order has the right to appeal to the court of appeals. The civil penalty of disqualification is for a period of not less than one year for the first violation, not less than five years for subsequent violations, but these mandatory minimums can be compromised, modified or even probated by the Secretary "in his discretion."[18]

18.     Section 1825(d)(6) vests in the U.S. district courts "jurisdiction in all other kinds of cases arising under this chapter" except as in §1825(b) and (c), where jurisdiction rests with the USDA's administrative courts and the courts of appeal. This subsection vests jurisdiction in the district courts for a lawsuit challenging the Department's rules, and does not require exhaustion of administrative remedies.[19]

19.     Section 1828 authorizes the Secretary to issue rules and regulations to carry out the provisions of this chapter. The statute does not authorize the Secretary to create a new system of penalties and enforcement procedures other than those provided in the chapter by Congress. Under §1829 state law is not preempted by the HPA, except where there is a direct and positive conflict with state law and this chapter.[20]

C.     **CURRENT DEPARTMENT REGULATIONS**

20.     The Department's current regulations are at 9 C.F.R. § 11(2011). Section 11.1 defines a "Horse Industry Organization" as a group of people engaged in the promotion of horses through shows, sales, and activities for the advancement of horses. "Inspections" are done to determine "compliance with the act." "Designated Qualified Person" means one who meets "the requirements specified in §11.7 of this part who has

---

[18] Ex.A, 1Apx.5-6, ¶ 14; Ex.2, 1Apx.64-65.
[19] Ex.A, 1Apx.6, ¶ 15; Ex.2, 1Apx.65.
[20] Ex.A, 1Apx.6, ¶ 16; Ex.2, 1Apx.69.

13

been licensed as a DQP by an [HIO] having a DQP program certified by the Department" to whom management can delegate authority to inspect horses for soreness under §1823(c) of the act.[21]

21.     Section 11.7 provides the rules for certification and licensing of DQPs. "The Department will not license DQP's on an individual basis. Licensing of DQP's will be accomplished only through DQP programs certified by the Department and initiated and maintained by horse industry organizations and associations." The HIOs make application to the Department, describing the organization and providing the criteria it uses for selecting DQPs, most of which are specified by the USDA's regulations. Under §11.7(g), the certification of the HIO program can be revoked for failure to comply with the regulations.[22]

22.     Section 11.20 prescribes the responsibilities of management. If management designates a DQP to inspect horses, then it cannot interfere with or try to control the DQP. Management must "immediately disqualify or disallow from being shown" any "horse identified by the DQP" as sore.[23]

23.     Section 11.21(d) provides that the "certified DQP organization shall assess appropriate penalties for violations, as set forth in the rulebook of the certified program under which the DQP is licensed or as set forth by the Department" and shall report the penalties to the Department.[24]

24.  Section 11.41 requires each HIO that sponsors a show to furnish by March 1 of each year "its rulebook, and disciplinary procedures for the previous year pertaining to violations of the Horse Protection Act or regulations, applicable to such horse show...."

---

[21] Ex.A, 1Apx.6, ¶ 18; Ex.3, 1Apx.74-75.
[22] Ex.A, 1Apx.7, ¶ 19; Ex.3, 1Apx.81-85.
[23] Ex.A, 1Apx.7, ¶ 20; Ex.3, 1Apx.86-87.
[24] Ex.A, 1Apx.7, ¶ 21; Ex.3, 1Apx.88.

The HIOs must provide quarterly reports of all disciplinary actions.[25]

## D.    THE NEW RULE, 9 CFR §11.25

25.    On May 23, 2011, the USDA proposed to amend the HPA regulations, publishing in the Federal Register the proposed rule.[26]  The new rule issued a year later on June 7, 2012.[27]  The proposed rule and the new rule are essentially the same. The new rule adds section 11.25 to the existing regulations.  Section 11.25(a) provides that "[e]ach HIO that licenses DQPs in accordance with §11.7 must include in its rulebook, and enforce, penalties for the violations listed in this section that equal or exceed the penalties listed in paragraph (c) of this section and must also enforce the requirement in paragraph (d) of this section."[28]

26.    Section 11.25(b) introduces the word "suspensions," a term not defined or used in the HPA.  Section 11.25(b) requires that suspensions be imposed on "individuals who are responsible for showing the horse, exhibiting the horse, entering or allowing the entry of the horse in a show or exhibition ...."  This includes a manager, trainer, rider, custodian or seller. "In addition, if the owner allowed any activity listed in this paragraph, the owner must be suspended as well."[29]

27.    Section   11.25 (b)(3)  requires that a "person who is suspended must not be permitted to show or exhibit any horse or judge or manage any horse show, horse exhibition, or horse sale or auction for the duration of the suspension."   Section 11.25(b)(4) requires that multiple suspensions be served consecutively.[30]

28.    Section 11.25 (c) prescribes the mandatory minimum penalties: (1) for a bilateral

[25] Ex.A, 1Apx.7, ¶ 22; Ex.3, 1Apx.90.
[26] Ex.A, 1Apx.7, ¶ 23; Ex.4, 1Apx.92.
[27] Ex.A, 1Apx.7, ¶ 23; Ex.7, 2Apx.162-194.
[28] Ex.A, 1Apx.7-8, ¶ 23; Ex.1, 1Apx.51-52.
[29] Ex.A, 1Apx.7-8, ¶ 23; Ex.1, 1Apx.52.
[30] Ex.A, 1Apx.8, ¶ 24; Ex.1, 1Apx.52.

sore, dismissal of the horse for the rest of the show, plus for the first offense a one-year suspension, two years for the second, and four years for three or more violations; (2) for unilateral soreness, dismissal of the horse from the remainder of the show, and for each responsible person for the first offense a 60-day suspension, for the second 120 days, and subsequent offenses one year; (3) for a scar rule violation, the horse must be dismissed from the show and for a person the first offense a two-week suspension, second offense 60 days, subsequent offenses one year; (4) for foreign substance violations, show dismissal (horse) if detected before the show, but if detected after the show, a two-week suspension (person); (5) equipment violations are the same as for foreign substance violations; and (6) dismissal of the horse from the show is mandated for shoeing, heel-toe, and unruly horse violations. For person found violating a suspension, an additional six-month suspension is required.[31]

29.     Section 11.25(e) requires the HIO to provide a process for the accused person to appeal a suspension, and the HIO's appeal procedures are subject to Department approval. The appeal must be completed within 60 days or the person must begin serving the suspension. The regulation does not include criteria for or a description of an acceptable appeal process.[32]

30.     Section 11.25(e) states that the Department can bring enforcement actions against someone who has been accused of a violation under §11.25(c) including violations where an HIO assessed a penalty.[33]

E.     **BACKGROUND ON HIO ENFORCEMENT**

31.     HIOs have worked with APHIS to develop rulebooks that provided contractual

---

[31] Ex.A, 1Apx.8, ¶ 25; Ex.1, 1Apx.53.
[32] Ex.A, 1Apx.8-9, ¶ 26; Ex.1, 1Apx.54.
[33] Ex.A, 1Apx.9, ¶ 27; Ex.1, 1Apx.54-55.

penalties to those people who enter sore horses. A 1999 plan, agreed to by the Department and HIOs, provided that if the HIOs would enforce their rulebooks' monetary and suspension penalties, the Department agreed not to institute enforcement proceedings against those who were penalized under the HIOs' rules and procedures. At the end of 2000, the Department proposed a three-year plan and all the HIOs signed it. The plan gave the HIOs initial enforcement responsibility under the act. Under this plan the USDA could bring Department enforcement proceedings under the Act only if (1) the HIO refused to assess and enforce its rulebook penalty, (2) the VMO said there was a violation but the PDQ disagreed (thus no HIO penalty was assessed), or (3) the Department found that the HIO was not abiding by the terms of the plan.[34]

32.     The 2007 Annual Report on the Horse Protection Act recognized that the "DQP program provides one of the primary mechanisms for detecting sore horses."   It noted that since 1999, APHIS and the industry had agreed to operate under several Horse Protection Plans.  After the 2007-2009 Operating Plan expired, the Department tried to get the HIOs to agree to mandatory suspensions. When this failed, the Department issued the proposed regulation.  In 2010 and 2011 there was no agreed plan, yet the Department continued to rely on the HIOs for almost all inspection and enforcement.[35]

## F.     THE 2010 OIG AUDIT REPORT

33.     In 2010 the USDA's Office of Inspector General issued an audit report of APHIS' administration of the HPA (the "OIG Audit").  The OIG Audit found that the HIO system did not function as intended, and it recommended discontinuing the HIO/DQP system in favor of the Department requiring independent, USDA-accredited

---

[34] Ex.A, 1Apx.9, ¶ 28-29.
[35] Ex.A, 1Apx.9, ¶ 30; Ex.5, 1Apx.97-108.

veterinarians perform the inspections and the USDA enforce the HPA.[36]

34.     In proposing the new rule, the USDA ignored the OIG Audit recommendations and findings, and it misstated the audit's contents in an attempt to justify the rule. The conclusions in the audit are unambiguous. Its first recommendation was to "[a]bolish the current DQP system and establish by regulation an inspection process based on independent accredited veterinarians, and obtain the authority, if needed, to charge show managers the cost of providing independent, accredited veterinarians to perform inspections at sanctioned horse shows, sales and other horse related events." The OIG Audit concluded that "inspection based on DQPs is not working to accomplish the goals of the law, primarily because DQPs are not independent of the horse show organizers who employ them," which could be solved by having inspectors report to APHIS and work directly for the agency.[37]

35.     The OIG Audit also found that if APHIS made independent veterinarians USDA agents, the inspection costs could be passed along to the shows, thereby replacing DQPs and HIOs. The OIG Audit estimated this new inspection system would increase the current entry fees by 9% to 19%, an increase of about $5.22 per horse. While this would cover the cost to APHIS of the veterinarian inspectors, it would not cover the costs of Department's civil enforcement proceedings, an activity presently carried out by the HIOs at no cost to the government. Because Congress had appropriated a maximum of $500,000 per year to enforce the HPA, the OIG Audit recommended the USDA seek more funding from Congress for enforcement proceedings.[38]

36.     The OIG Audit also recognized that even with more funding, APHIS could not

---

[36] Ex.A, 1Apx.10, ¶ 31; Ex.6, 1Apx.109-160.
[37] Ex.A, 1Apx.10, ¶ 32; Ex.6, 1Apx.113-116.
[38] Ex.A, 1Apx.10-11, ¶ 33; Ex.6, 1Apx.129-130.

prosecute all, or even most, violators. Under the present system, when APHIS' VMOs find a violation, they collect evidence and forward it to the USDA's Office of General Counsel, whose attorneys review the file, and generally only accept bilateral soring or scar rule cases for enforcement. Thus, the OIG observed, "[f]ederal investigations and enforcement can be slow, cumbersome, and culminate in uncertain outcomes...." The OIG Audit recommended that the USDA also authorize APHIS veterinarian-inspectors to issue tickets, much like DQPs do now, but authorize the inspectors to negotiate an agreed penalty with the alleged offender. The APHIS authorized inspector "could better ensure that individuals who violate the Horse Protection Act serve an appropriate penalty."[39]

37.     The OIG Audit found that APHIS inspectors attending shows can be subject to a hostile reception, "are often subjected to harassment from organizers, exhibitors, and spectators" and they are "routinely escorted by police and security personnel for their own protection." This weighed against continuing the DQP system, because "[i]t is unreasonable to expect that DQPs – part-time employees hired by the show organizers – will be able to reliably enforce the law under conditions as hostile as these, even if they were inclined to do so."[40]

38.     The new rule rejects the OIG Audit recommendations and continues the DQP system. The USDA asserts that "having consistent penalties would result in more effective enforcement of the Act and its regulations." The OIG Audit did not study or address the "lack of uniform penalties." The USDA's contention, that based on "this recommendation," it developed the "minimum penalty protocol that we intended for every HIO to include in its rulebook," misstates what the audit recommended, which was

---

[39] Ex.A, 1Apx.10-11, ¶ 33-34; Ex.6, 1Apx.127.
[40] Ex.A, 1Apx.11, ¶ 35; Ex.6, 1Apx.128.

eliminating the DQP/HIO system.[41]

## G. THE 2010 AND 2012 ECONOMIC ANALYSIS REPORTS

39.     The Department, in justifying the proposed regulation, certified that the cost to

HIOs would not be significant because HIOs already have enforcement programs. This

certification is based on two virtually identical reports dated April 2011 and February

2012, entitled "Analysis in Support of Certification that the Rule will not have a

Significant Economic Impact on a Substantial Number of Small Entities" ("Economic

Analysis"). These reports, a procedural requirement under the Regulatory Flexibility

Act, evaluate the anticipated expense or cost increase to small businesses of any proposed

rule. If an economic analysis finds no impact on small businesses, the Secretary can

certify there is no impact and avoid doing a complete impact study of alternatives to the

proposed regulation. Based on the Economic Analysis reports, the Department certified

there would be no adverse impact on small businesses. The findings in the reports do not

address or consider the effect of the new rule on HIOs ability to administer their appeal

procedures.[42]

40.     This Economic Analysis reports conclude that since HIOs administer their own

programs, "the proposed rule is not expected to impose additional costs upon HIOs or

show participants...." To justify this conclusion, the reports analyze the horse culture in

the United States: there are 9.2 million horses in the U.S; about one-third of the owners

participate in shows and competitive riding, representing 2,718,954 horses; 46% of

participants have incomes between $25,000 and $75,000; the horse industry directly

contributes more than $38 billion dollars to the GDP, with $10.8 billion attributable to

---

[41] Ex.A, 1Apx.11-12, ¶ 36; Ex.6, 1Apx.93.
[42] Ex.A, Apx.29, ¶ 82; Ex.10, 2Apx.246-256.

showing; and in 2004, by one estimate, there were about 62,000 Tennessee walking horses in Tennessee.[43]

41.     The cost for DQP inspections is part of the entry fee.  But there is no information in the reports about the costs HIOs incur in administering appeals in their enforcement programs; and the Economic Analysis reports fail to consider that HIOs will need to provide due process in their appeal process commensurate with the HPA due process guarantees.  Nor do the reports consider that with mandatory suspensions for offenses that now garner only a small fine there will be more appeals that HIOs must now complete, and that must completed within 60 days under the new rule.   The Economic Analysis reports do not address and fail to anticipate the increased number of hearings that will result from the new rule's requirement that a suspension at one show by one HIO will now be a suspension from all shows.[44]

## V.   STANDARD OF JUDICIAL REVIEW OF DEPARTMENT ACTIONS

42.     Judicial review of agency actions under the Administrative Procedures Act requires the court to decide "all relevant questions of law, interpret constitutional and statutory provisions and determine the meaning and applicability of the terms of an agency action."  5 U.S.C. §706.  The court shall  "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity;   (C) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; (D) without observance of procedure required by law...."  5 USC § 706 (2)(A)-(D).  *Chevron v. Natural Resources Def. Council* is the

---

[43] Ex.A, 1Apx.29, ¶ 83; Ex.10, 2Apx.249-251.
[44] Ex.A, 1Apx.29, ¶ 84.

leading case involving judicial review of an agency action. 467 U.S. 837 (1984). Agency action must be rejected that is "inconsistent with the statutory mandate that Congress sought to implement [or] that frustrates the policy that Congress sought to implement." *Id.*

## VI. LEGAL GROUNDS FOR RELIEF

43.     Plaintiffs request the court hold unlawful and set aside the USDA's action in adopting the new rule and enjoin the Department from implementing it effective on July 9, 2012.

### A.    THE USDA'S CREATION OF PRIVATE TRIBUNALS TO ADJUDICATE AND ENFORCE FEDERAL LAW CONTRAVENES THE CONSTITUTION ARTICLE I, SECTIONS 1 AND 8, AND ARTICLE III, SECTIONS 1 AND 2.

44.     The USDA is a department in the executive branch. The executive branch cannot legislate: Article I, section1 of the Constitution, provides that "[a]ll legislative Powers herein granted shall be vested in a Congress...." Article I, section 8 vest in Congress the power to "regulate Commerce" and "[t]o constitute Tribunals inferior to the supreme Court." When Congress passed an act that prohibited showing sore horses, it provided that the Secretary could enforce the HPA by assessing administrative penalties of a fine or disqualification, provided that the accused was afforded statutory and constitutional due process. Congress vested adjudicatory functions in the USDA's administrative court, whose judgments imposing penalties are subject to review in the courts of appeals, while all other cases and controversies fall under the jurisdiction of United States district courts.[45] The new rule will create new tribunals, vesting authority to assess mandatory federal penalties in private tribunals, which will adopt adjudicatory procedures approved

---

[45] Ex.2, 1Apx.63.

by the Department.

45.     In creating an administrative court within the USDA, under APA §301 et seq., Congress authorized the USDA to adopt procedures for adjudication and enforcement of statutory administrative civil penalties.    The USDA's rules, found in 9 C.F.R.  §12, provide for the filing of complaints, docketing, pleadings, conferences, hearings, depositions, subpoenas, prohibitions against *ex parte* communications,  evidence at trials, assignment of judges, decisions by Administrative Law Judges (ALJ), appeals to the Judicial Officer (JO), who is the Secretary's designee, and post-hearing procedures.  The usual adjudicatory procedure begins with the disqualification of a horse at an event by the DQP or VMO, or both.  The Department may then file a complaint.  After notice from the Department, a trial is held before an ALJ, who takes evidence, renders a decision and may impose a penalty.  Either the respondent or the Department may appeal to the Department's JO, who is appointed as the representative of the Secretary.  The charged party can appeal an adverse JO decision to the court of appeals.[46]

46.     The new rule denies an accused those due process protections guaranteed by Congress, including the right to appeal a sanction to a congressionally created administrative tribunal or to an Article III court.    The Department's rule creates adjudicatory tribunals that are run by private entities whose decisions are final as to the accused. Creating these private adjudicatory tribunals to enforce USDA-mandated sanctions, without any review by a congressionally created administrative court, or an Article III court, violates the Constitution, Article III, sections 1 and 2.  Section 1 provides that "[t]he judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as Congress may from time to time ordain and

---

[46] Ex.A, 1Apx.15, ¶ 45; Ex.8, 2Apx.195-218.

establish." Section 2 provides "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States [and] to Controversies to which the United States shall be a Party...."

47. Only Congress can create tribunals inferior to the Supreme Court with the power to determine factual and legal controversies involving federal law. It has long been recognized that the inferior tribunals need not be Article III courts.

> "[T]he judicial power of the United States, although it has its origin in the Constitution, is ... dependent for its distribution and organization, and for the modes of its exercise, entirely upon the action of Congress, who possess the sole power of creating tribunals ... for the exercise of judicial power, and of investing them with jurisdiction either limited, concurrent, or exclusive, and of withholding jurisdiction from them in the exact degrees and character which to Congress may seem proper for the public good."

*Cary v. Curtis*, 44 U.S. 236, 245 (1845). "Basic to the constitutional structure established by the Framers was their recognition that '[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny.'" *Northern Pipeline Construction v. Marathon Pipe Line Co.,* 458 U.S. 50, 57 (1982)(quoting The Federalist No.47, p.300 (H. Lodge ed. 1888)(J. Madison). The new rule contravenes these constitutional provisions by attempting to sanction individuals with federally mandated penalties, in tribunals that are not congressionally created administrative courts or Article III courts, and whose decisions are not subject to review and final adjudication by administrative courts or Article III courts.

**B.      THE NEW RULE VIOLATES THE ADMINISTRATIVE PROCEDURES ACT AND THE CONSTITUTION BY CREATING ADJUDICATORY TRIBUNALS IN PRIVATE ENTITIES AND UNLAWFULLY DELEGATING TO THEM ENFORCEMENT POWER UNDER FEDERAL LAW.**

48.      In the HPA, Congress directed that the "Secretary shall prescribe requirements for

the appointment by the management of any horse show…of **persons qualified to detect and diagnose a horse which is sore or otherwise inspect horses for the purposes of enforcing this chapter.**" (emphasis added).[47] Congress did not instruct or authorize the Secretary to promulgate regulations that qualify private persons or corporations to conduct hearings, determine facts, interpret laws and adjudicate whether a person whose horse was sore should be held responsible under the HPA and have government mandated suspensions imposed. The new rule is in excess of the USDA's statutory jurisdiction and authority, contravening 5 U.S.C. §706(C).

49.     The fundamental constitutional due process flaw in the new scheme is that it attempts to delegate to private entities the duty and right to impose penalties mandated by the government while denying the accused any possibility of agency or judicial review. It creates a private entity tribunal to decide who is responsible for violating the HPA and makes its decision final and non-appealable to the agency or a court. An accused who believes he has been denied a fair hearing or has been illegally punished cannot appeal to a congressionally created agency court or Article III court. The proposed regulation denies appellate review for even a constitutional claim.[48]

50.     Congress delegated to the USDA authority to adjudicate disputes involving the assessment or enforcement of sanctions for violating the HPA. But Congress did not authorize the USDA to sub-delegate the Department's enforcement power to private entities. Courts will permit the official named in a statute to sub-delegate the granted authority to another official in the agency if the act permits sub-delegation. Specific authorization in the act to delegate a function to a subordinate will not violate the

---

[47] Ex.A, 1Apx.20, ¶ 56; Ex.2, 1Apx.59.
[48] Ex.A, 1Apx.21, ¶ 58.

separation of powers doctrine. *United States v. Giordano,* 416 U.S. 505, 513 (1974). But the ability to delegate within an agency does not extend to delegating the official's power to those not in the agency. *See, Shook v. Dist. of Col. Fin. Resp. and Man. Auth.,* 132 F. 3d. 775, 782-783 (D.C. Cir. 1988). Here, the USDA delegates its enforcement power to private entities and makes the entities' decisions not reviewable by the USDA's administrative tribunal or an Article III court, even though Congress provides that the Department's enforcement decisions are subject to Article III court review.

51.     Under the new rule, HIOs must impose penalties dictated by the USDA. These penalties will affect the property interests of those against whom they are assessed. Whether a participant is responsible for violating the HPA will be adjudicated by a tribunal whose procedures must be submitted to and approved by the USDA. While this is intended to increase enforcement of the Act with no cost to the Department, and may be a convenient way to enforce the Act, it is nonetheless unlawful. "The 'fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of the government, standing alone, will not save it if it is contrary to the Constitution.'" *Free Enter. Fund v. Public Co. Accounting Oversight Bd.,* 130 S.Ct. 3138, 3144 (2010). The USDA's regulation, compelling private entities to adjudicate whether a person is responsible for violating the HPA and dictating the penalties to be imposed, without the right to agency and judicial review contravenes not only HPA §1825(b) and (c), it contravenes the very structure of the Constitution. Congress did not create the HIOs as courts to enforce federal law in cases and controversies to which the government is a party, and the Department's attempt to do so violates the Constitution.

**C.     THE NEW RULE'S MANDATORY MINIMUM SUSPENSION PENALTIES, IMPOSING SUSPENSIONS FROM ALL SHOWS, IS NOT IN ACCORDANCE WITH THE HPA, AND IS IN EXCESS OF THE USDA'S STATUTORY AUTHORITY UNDER THE HPA.**

52.     The new rule's mandatory minimum suspension penalty, imposed on individuals barring them from all shows, is not in accordance with law and is in excess of the USDA's statutory authority under the HPA, violating APA §706(A) and (C). In the new rule, the USDA mandates that HIOs impose suspensions against owners, managers, trainers, riders, custodians, and sellers who enter, exhibit or sell a sore horse at an event or auction. The word "suspension" does not appear in the HPA. In amending the Act in 1976, Congress added §1825(c), which authorized "disqualification of offenders" by the USDA, meaning that a penalty barring an offender from all shows for a period of time could be assessed by the Department. The USDA offers no distinction between "suspension" and "disqualification," and there is no difference. Suspensions under §11.25(b) of the new rule and disqualifications under HPA §1825(c) have the same effect— the person penalized cannot show or enter a horse in any event in the nation for a designated time period.[49]

53.     The HPA uses the word "disqualify" in two contexts. In §1823, management must "disqualify any horse" from a show if it is sore or identified by the DQP to be sore. And "disqualify" is used in the §1825(c), headed "Disqualification of offenders," which provides: "In addition to any fine, imprisonment, or civil penalty authorized under this section, **any person** who has been convicted under subsection (a) of this section or who has paid a civil penalty assessed under subsection (b) of this section or is subject to a final order under such subsection assessing a civil penalty ... **may be disqualified by order of the Secretary, after notice and an opportunity for a hearing before the**

---

[49] Ex.A, 1Apx.12-13, ¶ 38-39.

**Secretary**....." (emphasis added.)[50]

54.     The new rule directly contradicts Congress' express requirements that the Secretary must meet before a person (as distinguished from a horse) can be disqualified from entering, showing or exhibiting any horse in any show for a minimum time period. Congress dictated that disqualification of a horse from a show is permitted based solely on the determination of the DQP.   Congress did not authorize an HIO, a DQP, management, or any private entity to disqualify individuals from all horse shows.

55.     Even the Secretary is restricted in disqualifying people from exhibiting a horse. Before a person can be disqualified under §1825(c) from participating in events, that person must be convicted under §1825(a) or been assessed a fine by the Department under §1825(b) and paid a fine, thus making the penalty assessment in (b) final, or the order assessing the monetary penalty must be final, even if the fine has not yet been paid. Congress imposed the requirement that there must be a final order pursuant to §1825(a) or (b), before there could be a disqualification under §1825(c) because it did not intend disqualification to accompany every violation, but only those that were particularly egregious.   Under the new rule, HIOs must disqualify people allegedly violating the HPA, even if the offender has not been convicted of violating the HPA or has not had a final order entered by the Department assessing a §1825(b) fine.[51] The new rule is the Department's effort to avoid the time-consuming process of administrative proceedings under §1825(b), and mandates disqualifications in a way that contradicts Congress' dictates about the conditions precedent to disqualification, contravening APA §706(B) and (C).

---

[50] Ex.A, 1Apx.13-14, ¶ 40-41; Ex.2, 1Apx.64.
[51] Ex.A, 1Apx.14, ¶ 43; Ex.2, Ex.2 1Apx.63-64.

56.     The new rule's requirement that the minimum suspensions are mandatory, without any discretion being allowed to the HIO to mitigate the period of suspension, violates the statutory requirement in §1825 (b), which is incorporated into §1825(c). Although HPA §1825(c) imposes a one-year disqualification, the HPA does not make the time period mandatory. Rather, the HPA requires that the Secretary, in disqualifying a person, "**shall** take into account" factors that would mitigate a penalty. Those mitigating factors that Congress dictated that the Secretary "**shall take into account**" include "nature, circumstances, extent, and gravity of the prohibited conduct" and as to the accused "the degree of culpability, any history of prior offenses, ability to pay, effect on ability to continue to do business, and such other matters as justice may require." (Emphasis added.) An HIO is prohibited from taking into account the mitigating factors Congress required be taken into account in penalizing those who have allegedly violated the HPA.   The new rule's mandatory suspensions remove any discretion from the sentencing tribunal, in this case the HIO, directly contradicting Congress' intent that discretion shall always be employed before sentencing.[52] This contravention of the HPA violates APA §706(A) and (C).

57.     In addition, Congress provided that the "Secretary may, in his discretion compromise, modify or remit" any civil penalty, discretion that is again denied to the HIOs by the new rule's requirement that the HIO assess a mandatory minimum suspension. The discretion Congress granted the Secretary in sentencing offenders, the Secretary denies to an HIO when it imposes sentences.[53] In denying this congressionally delegated power to the HIOs, the new rule contravenes APA §706(A) and (C).

---

[52] Ex.A, 1Apx.15, ¶ 46; Ex.2, 1Apx.64-65.
[53] Ex.A, 1Apx.16, ¶ 47; Ex.2, 1Apx.64-65.

58.     Congress authorized civil penalties of "not more than $2,000 for each violation" and disqualification "for a period of not less than one year for the first violation and not less than five years for any subsequent violation."   The new rule sets mandatory minimum suspensions for HIO-charged violations that are less than those set by Congress.   For example, under §11.25(c)(2) of the new rule,  the mandatory minimum suspension for the first "unilateral sore" offense is 60 days.  The USDA's justification for proposing the new rule states:   "We are proposing to amend the horse protection regulations to require horse industry organizations or associations that license Designated Qualified Persons to assess and enforce minimum penalties for violations of the Horse Protection Act and regulations."  Presumably the Department assumes that if the HIO suspensions are less than those in §1825(c), those penalized by HIOs will not complain, because punishment for the same offense by the Department would be more severe.[54] But the Department cannot legislate, through its regulations, penalties that are inconsistent with those in the Act.

59.     Only Congress can change the pre-conditions to assessing a penalty of disqualification, or its mandate that mitigating circumstances shall be considered, or that probation can be accorded the accused, or reduce the penalty prescribed in the Act.  The USDA, as an agency in the executive branch, cannot repeal the penalties and procedures for assessing them that Congress established. "[R]epeal of statutes, no less than enactment, must conform to Art. I." *INS v. Chadha,* 462 U.S. 919,954 (1983). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York,* 524 U.S. 417, 438 (1998). The new regulation is invalid under 5 USC §706 (A) and (C) because it is "not in accordance with

---

[54] Ex.A, 1Apx.16, ¶ 48; Ex.4, 1Apx.92.

law" and in excess of statutory authority.

**D.      THE NEW RULE DENIES PARTICIPANTS CONSTITUTIONAL AND STATUTORY DUE PROCESS, CONTRAVENING APA §706(B).**

60.      Critically, the new rule will unlawfully deny horse show participants due process of law.[55] A fundamental element, due process requires that the adjudicatory body be independent of the executive and legislative authorities. "It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" *Caperton v. A.T. Massey Coal Co. Inc.,*129 S.Ct. 225 (2009). The U. S. Constitution creates the paradigm for judicial independence. Congress makes the laws, the executive executes the laws and the courts adjudicate their proper enforcement.   Each branches' authority is independent of the others.

61      The new rule requires the HIOs to "enforce penalties for violations" of the HPA by imposing suspensions against "individuals … who are responsible for showing the horse…."[56]   In an affront to any shred of judicial independence, the new rule prescribes that if an alleged violator appeals, and the violation is overturned by the HIO's panel, the HIO must provide the USDA with the record on which the decision to overturn was made.  There is no similar requirement if the HIO affirms the suspension. If the USDA thinks an HIO is being too lenient, the USDA can decertify an HIO.   HIOs lack judicial independence; therefore, due process cannot be afforded to participants.

62.      The new rule violates the due process because HIOs will have no authority to interpret the law and will have to adhere to the Department's interpretations, which some

---

[55] Ex.A, 1Apx.14, ¶ 43.
[56] Ex.1, 1Apx.52.

courts have rejected. HIOs, during appeals, will be confronted with legal issues that they have no authority to decide. The HIOs will have to follow the Department's interpretation of the law. The Department sometimes persists in asserting a rejected interpretation of the HPA. For example, new rule §11.25(b) requires the HIOs suspend an owner "if the owner allowed an activity listed in this paragraph." What does "allow" mean? The circuit courts are divided on what must be proved to hold an absent owner responsible when one of his or her horses is found to be sore on inspection. Some adopt the Department's position, that all the proof required is proof that the horse was sore and proof of ownership. Several court's reject this interpretation, permitting the owner to show his or her innocence.[57]

63.      When there is a conflict between circuits, the Department's position is that the legal rule is determined by the home circuit of the accused. If the accused lives in the 8th or 6th circuits, the legal interpretation of "allow" in determining an owner's responsibility will not be a strict liability standard. SHOW's present rulebook follows those circuits' interpretations of the HPA.   But there is only one statute. To apply different interpretations based on whether the accused's home circuit court rejects or accepts the USDA's interpretation will not work when an HIO must determine if there was a violation of federal law.  The accused will have no right to appeal an HIO suspension to any circuit court of appeals.  The Department, which will decertify HIOs if it believes they are not correctly applying the law, will insist its interpretation of the law be applied. HIOs will lack judicial independence during the HIOs' Department-approved appeal procedures.   Contestants will avoid shows with HIO affiliation because they cannot

---

[57] Ex.A, 1Apx.38, ¶ 109; Ex.32, 4Apx.554-557; Ex.41, 4Apx.604-613; Ex.43, 4Apx.620-626; Ex.47, 4Apx.651-657; Ex.49-50, 5Apx.657-718.

receive a fair hearing by an unbiased tribunal, with a reasonable degree of judicial independence. This will encourage contestants to avoid HIO affiliated shows and go to shows without HIO inspections.[58]

64.    Likewise, the new rule violates due process because a participant's appeal to the HIO, the HIO's decision, the HIO imposed suspension and the participant's serving a suspension or being acquitted, are all meaningless. The Department is not bound by the HIO decision and can seek and enforce penalties under the HPA with no credit given for a suspension served and no right to plead a bar to further prosecution by those who prevailed at the HIO appeal. Under, §11.25(e), the Department "retains the authority to initiate proceedings with respect to any violation...." This is so whether the accused is acquitted or punished as a result of the HIO appeal, the HIO's appeal panel's decision being no bar to additional Department prosecution. Currently, a show entrant agrees to the HIO procedures when signing the entry form, which contractually makes the HIO's decision final and binding on the participant. But the regulation does not make the HIO decision binding on the Department. By rejecting the principles of *res judicata* and credit, the new rule is unlawful.[59] It is fundamental to due process fairness that "a controversy should be resolved once, not more than once." *Univ. of Tenn. v. Elliot*, 478 U.S. 788, 789, fn.6 (1986). "[I]t is sound policy to apply principles of issue preclusion to factfinding of administrative bodies acting in a judicial capacity." *Id.* at 797.

E.    **BECAUSE THE ADMINISTRATIVE RECORD DOES NOT SUPPORT THE NEW RULE IT IS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION IN VIOLATION OF APA §706(A).**

65.    The APA requires a court to declare unlawful an agency rule that is arbitrary,

---

[58] Ex.A, 1Apx.39, ¶ 110.
[59] Ex.A, 1Apx.39-40, ¶ 111-113; Ex.56-57, 5Apx.822-829; Ex.67-68, 7Apx.1033-1086.

capricious, an abuse of discretion, or otherwise not in accordance with law. An agency violates this standard if it entirely fails to consider an important aspect of the problem, makes a decision that runs counter to the evidence before the agency or provides implausible explanations for its actions. *Ranchers Cattleman Action v. USDA*, 415 F.3d 1078, 1093 (9th Cir. 2005). While a department's rules or regulations are presumed to be valid, the court "cannot uphold a regulation on grounds other than those relied on by the agency." *Id.* And as a corollary, "the court evaluates the agency decision based on the record the agency presents to the court." *Harlan Land Co. v. USDA*, 186 F. Supp.2d 1076, 1084 (E.D. Cal. 2001). Additionally, an "agency must cite to information to support its position; without data the court owes no deference to an agency's line-drawing." *Id.*

66. The USDA administrative record supporting the new rule is identified in the June 7, 2012, explanation and justification accompanying the announcement of the adoption of the new rule. The first item identified is the September 2010 OIG Audit Report. The next documents relied on by the Department were the April 2010 and February 2012 Economic Analysis Reports, required by the Regulatory Flexibility Act. Finally, the Department referenced its annual reports on enforcement and suspensions, which are found on its website.[60] Based on this record alone, the new rule is arbitrary, capricious, an abuse of discretion and will frustrate the goal of the HPA.

### 1. The requirement that HIOs complete appeals within 60 days is arbitrary, capricious and not supported by the administrative record.

67. The requirement that the accused begin the suspension within 60 days of the event and that appeals be concluded within 60 days is arbitrary and an abuse of discretion;

---

[60] Ex.A, 1Apx.23-24, ¶ 65-66; Ex.A, 1Apx.29, ¶ 82.

there is no evidence in the record to judge whether it is reasonable, and it was formulated without observance of procedures required by law.

68.     One cannot decide whether 60 days is reasonable or arbitrary unless the procedure that will be followed is outlined in the rule, yet the new rule contains no appeal procedure. The USDA requires the HIOs to submit for approval appeal procedures that assure the accused the HPA's due process provisions and complete the appeal process within 60 days of the event.  Whether or not it is reasonable to require alleged violators to begin serving suspensions within 60 days and whether it is reasonable to require HIOs to conclude appeals within 60 days can only be determined by evidence establishing the reasonable time required to complete the process based upon some existing procedure adopted for adjudication.[61]   A "court has no basis for determining whether APHIS' decision is arbitrary, capricious or an abuse of discretion because APHIS does not describe the standard under which it concluded" 60 days was enough time. *Harlan Land Co.,* 186 F.Supp.2d at 1087.  For the courts to uphold a prescription by an agency, the agency "must disclose the basis of its order and give clear indication that it has exercised the discretion with which Congress has empowered it." *Burlington Truck Lines Inc. v. United States,* 371 U.S. 156,168 (1962)(internal quotes and citations omitted).

69.     The new rule's 60-day deadline is not supported by the findings and recommendation of the OIG Audit.  The OIG Audits conclusion was clear: "[a]bolish the current DQP system and establish by regulation an inspection process based on independent accredited veterinarians...."[62]

70.     Based on the OIG Audit, the Department cannot justify making HIOs the

---

[61] Ex.A, 1Apx.22, ¶ 61-63.
[62] Ex.6, 1Apx.129.

enforcers of USDA-dictated mandatory minimum penalties, which are adjudicated within 60 days under a process in an HIO's rulebook that must be approved by the USDA. Nothing in the Audit suggested this new rule, much less justified it. As the OIG Audit noted, it is unlikely that DQPs will be able to withstand the pressure of hostile participants if they become quasi-agents for APHIS, inspecting 100% of the entries, and issuing tickets that result in mandatory suspensions from all shows.[63] The new rule is not only not supported by the Audit's findings and recommendations, it is self-defeating based on those findings.

71.    Evidence outside the Audit, but referenced by it, overwhelmingly supports the conclusion that the new rule is arbitrary, capricious, an abuse of discretion, violates statutory and constitutional rights, and is not proposed in accord with procedures required by law. As a part of the official record, the court should also review the reports of the Department on the activities of DQPs and APHIS, the suspensions issued by the Department and the HIOs, and the Department's and courts' public records of the agency's enforcement action. These documents illustrate that enforcement proceedings, which provide HPA mandated due process, are time consuming and expensive. Reviewing these documents is necessary to evaluate whether it is reasonable for the Department to require HIOs to develop USDA-approved procedures for appeals that dispose of cases within 60 days.[64]

72.    This court must also decide whether the 60-day procedure is fair to participants in a way that will meet requirements of due process, and will not increase costs to the HIOs, driving them out of business. If such documents are not part of the administrative record,

---

[63] Ex.6, 1Apx.128.
[64] Ex.A, 1Apx.23, ¶ 65-66.

then the record should be supplemented with them because: (1) "the agency deliberately or negligently excluded documents that may have been adverse to its decision" and (2) "the district court [will] need the record with 'background information' in order to determine whether the agency considered all the relevant factors" and (3) "the agency failed to explain administrative action so as to frustrate judicial review. " *Medina County Envtl. Action Assoc. v. Surface Transp. Bd.*, 602 F.3d 687, 706 ( 5th Cir. 2010 ).

73.    No public information has been identified by the Department to justify the requirement that HIOs develop an appeal process approved by the Department that will dispose of appeals within 60 days. However, the OIG Audit Report relied, either directly or indirectly, on HIO and USDA Enforcement Activity Reports.  JO decisions and court of appeals decisions applying HPA are relevant evidence about the HIOs' ability to enforce the HPA.   These records prove that an HIO, like SHOW, cannot possibly afford the due process Congress included in the HPA or meet minimal constitutional due process standards, and the documents should be considered by the court in determining whether the new rule is arbitrary, capricious and unreasonable in violation of 5 U.S.C. §706.

74.    In 2007, the Department's Veterinarian Medical Officers (VMOs) attended 31 events performing 7,984 inspections; in 2008 they attended 37 events performing 2,158 inspections; in 2009 they attended 36 events performing 2067 inspections, in 2010 they attended 59 events performing 1,726 inspections; and in 2011 they attended 83 events performing 11,638 inspections.  Over five years, USDA VMOs attended 246 events, an average of 49 a year, and performed 25,573 inspections, an average of 5,115 per year.[65]

---

[65] Ex.27, 4Apx.512-514; Ex.12, 2Apx.260-263; Ex.14, 2Apx.282-289; Ex.16, 2Apx.319-322; Ex.18, 3Apx.348-355.

76.     In 2007, HIOs provided DQP inspectors at 506 shows, performing 109,008 inspections and finding 629 violations.  In 2008, DQPs attended 532 events, performed 111,932 inspections, and found 637 violations. In 2009, DQPs inspected at 436 shows, performing 70,122 inspections and finding 889 violations.  In 2010, DQPs attended 423 shows performing 76,732 inspections and finding 1,388 violations.   In 2011 DQPs inspected at 474 shows, performed 84,023 inspections and cited 875 violations.  From 2007 through 2011, HIO DQPs inspected at 2,371 events, an average of 474 events per year. Over that period, HIO DQPs performed 451,181 inspections, an average of 90,363 inspections per year.  DQPs cited 4,418 violations over the five years, an average of 884 per year.[66]

77.     These numbers indicate that, on average, the USDA attends only about 10% of the events attended by HIOs.  HIOs perform almost 20 times as many inspection in a year compared to USDA inspectors.  HIOs perform the bulk of the activities that result in efforts to meet the goals of the HPA.[67]

78.     SHOW started inspecting in 2009.  In 2010 SHOW provided DQP Inspectors for 151 of the 423 events, or 36%, while in 2011 SHOW provided inspectors at 125 of the 474 events, or 26%.  SHOW is the largest HIO of those certified by the USDA.[68]

79.     Beginning in 2010, there was no agreed operating plan between the Department and the HIOs.  For 2010, the USDA published an HIO Suspension Report, providing the name of each suspended person, the suspension dates, the date of the ticket, the horse, and the HIO issuing the suspension.  That 2010 Report reflects that the HIOs imposed suspensions on 305 individuals.  One-day suspensions were imposed on 105 people.  One

---

[66] Ex.A, 1Apx.24, ¶ 67; Ex.24, 4Apx.512-516; Ex.13, 2Apx.264-281; Ex.15, 2Apx.300-318; Ex.17, 3Apx.323-348; Ex.19, 3Apx.356-383; Ex.22, 3Apx.412-438.
[67] Ex.A, 1Apx.24, ¶ 68.
[68] Ex.A, 1Apx.24, ¶ 69; Ex.27, 4Apx.514-515.

hundred and one people received two-week suspensions. Suspensions between two weeks to one year were imposed on 27 people.  Suspensions of one year were imposed on 27 people.[69]

80.    The USDA's 2011 HIO Suspension Report indicates that HIOs assessed suspensions on about 567 different people. But this list includes 64 suspensions that began in 2010 but continued into 2011. In 2011 HIOs imposed a total of 844 suspensions (one person may have received multiple suspensions) based on DQP inspections and tickets. Of those, 260, or 32%, received one-day suspensions; 466, or 58%, received two-week suspensions; 45, or 6%, received suspensions of between two weeks and one year; and 12, or 2%, received one-year suspensions.[70]

81.    The USDA's 2012 DQP Inspection Report, through June 6, 2012, reports 107 HIO affiliated shows, with DQPs inspecting 14,667 horses, resulting in tickets for 236 violations. SHOW, Inc. was the HIO at 33, or 33% of the events. The 2012 USDA HIO Suspension Report, through June 6, 2012, indicates 198 suspensions reported, but 60 of these were commenced prior to 2012, showing 138 suspensions reported thus far in 2012.[71]

82.    From these USDA reports, covering 2007 through 2012, it is evident that inspection, fines and suspensions of sore horses rests primarily with the non-governmental HIOs and individual DQPs. HIOs assess the overwhelming majority of suspensions, when compared to USDA disqualifications.

83.    The new rule mandates individuals be suspended for not less than one year for a bilateral sore horse for the first offense and a two-month suspension for a unilateral sore

---

[69] Ex.A, 1Apx.25, ¶ 70-71; Ex.20, 3Apx.384-403.
[70] Ex.A. 1Apx.25, ¶ 73; Ex.24, 3Apx.440-487.
[71] Ex.A, 1Apx.26; ¶ 74; Ex.25, 3Apx.488-500; Ex.26, 3Apx.501-511.

horse for the first offense.  According to the USDA reports on DQP inspections in 2010 and 2011, there were 1020 unilateral soring violations and 152 bilateral soring violations. Given that between one and three people could face suspensions for each of these violations (the exhibitor, owner and trainer),  HIOs will have to hear appeals on many more cases than are presently appealed, because these offenses do not presently always result in suspensions. The USDA did not consider the probable increase in the number of appeals to HIOs because of mandatory suspension.[72]

84.    The new rule will be impossible for HIOs to follow. The USDA failed to considered how time consuming, difficult and expensive prosecutions for disqualification have been for the Department under the due process procedures it follows under §1825(c). When a complaint is filed by the Department, it is referred to the Office of Administrative Law Judges.  ALJs use the Rules of Practice and Procedure for hearing the case. There are presently four ALJs who hear a wide range of proceedings falling under the USDA.  ALJ decisions can be appealed by the respondent or Department to the Judicial Officer (JO). Decisions by the JO may be appealed to the court appeals in the district where the defendant resides.[73]

85.    Reported JO and court of appeals decisions provide important information for evaluating whether HIOs can perform the USDA-mandated adjudicatory task within 60 days.[74]  The decisions reflect the time lapses between the violation, the filing of the complaint, the JO decisions and any court of appeals decisions.  The average time between the event giving rise to the alleged violation and the Department filing a complaint is about 23 months. The shortest time between the event and a JO decision

---

[72] Ex.A, 1Apx.26, ¶ 76.
[73] Ex.A, 1Apx.26, ¶ 77; Ex.28, 4Apx.517-525, Ex.29, 4Apx.526-532.
[74] Ex.A, 1Apx.27, ¶ 78.

under USDA procedures is 24 months, the longest is 89 months, and the average between

the event and a JO decision is 49 months. Where the accused exercises his or her

constitutional and statutory right to review by an Article III court, the shortest time period

between the event and a decision is 34 months, the longest is about 105 months, and the

average time lapse is about 70 months.[75]

86.    The Department's requirement that the HIOs complete their appeals within 60

days, while affording due process consistent with that required by the HPA, is not

reasonable and is arbitrary, violating APA §706(A).

### 2. The Department's conclusion that the new rule will not increase costs to HIOs is arbitrary and an abuse of discretion, violating APA§706(A).

87.    The Department, in justifying the new rule, certified that the cost to HIOs would

not be significant since HIOs already have enforcement programs.    This finding is

arbitrary, capricious and an abuse of discretion because it is based on the 2011 and 2012

Economic Analysis reports, which do not consider the effect of the regulation on HIOs in

administering their appeal procedures.[76]

88.    The Economic Impact Analysis reports conclude that since HIOs administer their

own programs, "the proposed rule is not expected to impose additional costs upon HIOs

---

[75] The analysis and summary of the courts of appeal and USDA JO opinions can be found in the McGartland declaration, Ex.17, 1Apx.27-28, ¶ 78-81.  These paragraphs are taken from and supported by the summary , Ex.31, 4Apx.540-553 and the chart Ex. 73, 8Apx.1144, based on these decisions: *Burton*, Ex.32, 4Apx.554-557; *Fleming*, Ex.33, 4Apx.558-568; *Thorton*, 4Apx.569-572; Ex.35, *Elliot*, 4Apx.573-581; *McConnell*, 4Apx.582; Ex.37, *Polch*, 4Apx.583-584; Ex.38, *Polch*, 4Apx.583-584;Ex.38, *Wagner*, 4Apx.585-589; Ex,39, *Kelly*, 4 Apx.590-593; Ex.40, *Gray*, 4Apx.594-603; Ex.41, *Baird*, 4Apx.604-613; Ex.42, *Rowland*, 4Apx.614-619; Ex.43, *Crawford*, 4Apx.620-626; Ex.44, *Bobo*, 4Apx.627-638; Ex.45, *Martin*, 4Apx.639-644; Ex.46, *Young*, 4Apx.645-650, Ex.47, 4Apx.651-657; Ex.48, *Reinhart*, 5Apx.655-656; Ex.49-50, *McCloy*, 5Apx.657-718; Ex.51, *McCulloch*, 5Apx.719-739; Ex.52, *Bowtie Stables*, 5Apx.740-775; Ex.53, *Trimble*, 5Apx.776-778; Ex.54, *Burgess*, 5Apx.779-812; Ex.55, *Chadway*, 5Apx.813-821; Ex.56 *McConnell*, 5Apx.822-829; Ex.57, *McConnell*, 6Apx.830-891; Ex.58, *Turner*, 6Apx.892-912; Ex.59, *Stewart*, 6Apx.913-935; Ex.60, *Gray*, 6Apx.936-938; Ex.61, *Zahnd*, 6Apx.939-945; Ex.62, *Zahnd*, 6Apx.946-978; Ex.63-64, *Bennett*, 7Apx.979-1008; Ex.65-66, *Lacy*, 7Apx.1009-1032; Ex.67-68, *Derickson*, 7Apx.1033-1086; Ex.69-70, *Back*, 7Apx.1087-1110; Ex.71, *Radar*, 7Apx. 1111-1132; and Ex.72, *Rodriguez*, 7Apx.1133-1143.  These cases were located, reviewed and summarized by plaintiffs' counsel.  The decisions are evidence of the time lapses and legal issues in the cases.
[76] Ex.A, 1Apx.29, ¶ 82.

41

or show participants...."   To justify this conclusion, the reports analyze the horse culture in the United States. However, there is no information in the reports about the present cost to HIOs for administering their own enforcement programs, and the analyses do not address the effect of the new rule's mandatory suspensions on the number of appeals that will result for violations presently subject to only a modest fine.   Nor do the reports consider the increased number of hearings that will result from the legal requirement that a suspension at one show by one HIO will now be a suspension from all shows.   Finally, the reports do not examine the present HIO appeal procedures and compare them to procedures that must be proposed and approved by the Department that ensure that all those accused have the full due process protections specified in the HPA.[77]

89.   While certifying that the new rule will not cause an increased financial burden on HIOs, ironically, the USDA justified shifting the burden of enforcement to HIOs because "such proceedings may be time-consuming and expensive, and [the USDA's] resources for prosecuting such cases are limited."[78] In addressing comments expressing concern about increased costs associated with mandatory suspensions, the USDA's responded, "Many HIO's currently charge fees for appeals in order to cover the costs of such activities.   Should there be a significant increase in appeals we expect that HIOs will be able to handle them."[79] One would predict that HIO enforcement proceedings will become more time consuming and expensive, just like USDA enforcement proceedings are time consuming and expensive.   The Department's conclusion to the contrary is unreasonable, arbitrary and not supported by a competent and truthful analysis.

90.   The complexity and expense to HIOs of the anticipated appeal proceedings under

---

[77] Ex.A, 1Apx.29, ¶ 83; Ex.10, 2Apx.256.
[78] Ex.4, 1Apx.93.
[79] Ex. 7, 2 Apx. 188.

the new rule is discernible from the reported cases of USDA enforcement under the statutory due process procedures. The cases are expensive to prosecute or defend because people, especially experts, disagree about whether a horse's responses during an examination indicate the horse has been sored. These examples from reported decisions illustrate the subjectivity of determinations that a horse is sore: in a 1977 case, two DQPs passed the horse while two VMOs disagreed. In a 1978 case, the DQP disagreed with the VMOs. In a 1989 case the DQP and VMOs agreed the horse was sore, but the ALJ found their testimony unpersuasive, while the JO agreed with the inspectors. In another 1987 case, the DQP passed the horse, the VMOs disagreed, the ALJ and JO agreed the horse had been sored, but the court of appeals thought they got it wrong and dismissed. In a 1991 case, the DQP passed the horse, the VMOs disagreed, the ALJ found no violation, but the JO reversed on the evidence. In a 1986 case, the DQPs and VMOs found soreness, but after hearing expert witnesses, the ALJ said there was no soring. On review the JO concluded otherwise, but the court of appeals found no substantial evidence to support that conclusion. In a 1990 case, the DQP had passed the entry, the VMOs failed the horse, the ALJ and the JO found a violation. In a 1998 case, there were five days of testimony involving four experts, where the DQP had passed the horse, the VMOs had failed the horse and the ALJ found a violation. In a 2000 case, the DQPs and VMOs agreed the horse was sore, but the ALJ found both lacked credibility, a decision that the JO found mistaken. Another 2000 case involved a hearing with six witnesses, three being experts, about a horse the DQP and VMOs found sore, where the ALJ found no violation, only to have the JO reach the opposite conclusion. In another 2000 case, two DQPs and two VMOs found soreness, but the ALJ disagreed after hearing five witnesses, including two veterinarians, only to be reversed by the JO. In a 2007 case, the horse was qualified

43

by the DQP, but failed by two VMOs, and after hearing 11 witnesses, of which two were experts, the ALJ found no violation, only to be reversed by the JO.[80]

91.    HIO adjudications, that will impose mandatory suspensions from all shows, will become as time consuming and expensive as the USDA proceedings, because those accused of offenses will have much more at stake than they do under the present system, and this will increase the number of appeals and their complexity. Whether a horse violates the HPA is a matter about which highly qualified witnesses often disagree. Experienced USDA ALJs who hear those witnesses reach conclusions disagreeing with some witnesses, which decisions competent JOs sometimes find mistaken, only to have Article III federal court justices find that the evidence does not support the JO's decision. Presently, contestants are not inclined to fight a DQP disqualification and ticket for a scaring violation that assesses a $100 fine. But they probably will fight one assessing a suspension from all shows where the suspension will be enhanced on a second or subsequent offense.[81]

92.    The Economic Analysis reports finding that there would be no increase in costs to the HIOs under the new rule failed to examine or mention how the HIOs presently finance and administer their enforcement proceedings. HIOs presently impose suspensions without significant expense because: (1) the suspensions are only for that HIO's shows, (2) few ticketed people appeal, and (3) the HIOs do not provide the due process provided by the USDA, as required by Congress, when suspensions are assessed. Nor do HIOs have to provide statutory and constitutional due process, since their right to suspend an offender is based on management's right to exclude people from entering

---

[80] Ex.A, 1Apx.30-31, ¶ 87, *See* decisions cited in footnote 76, 4Apx.55 4 through 7Apx.1143, particularly Ex.33, *Fleming*; Ex.39, *Kelly*; Ex.41, *Baird*; Ex.42, *Rowland*; Ex.43, *Crawford*; Ex.46, *Young*; Ex.56-57, *McConnell*; Ex.58, *Turner*; Ex.61-62, *Zahnd*; Ex.65-66, *Lacy*; and Ex.69-70, *Back*.
[81] Ex.A, 1Apx.31, ¶ 88.

their shows. HIOs get their enforcement power from the agreement participants sign when entering the show. Presently, HIOs are not enforcing the HPA with regard to people — they can only disqualify horses under the HPA— and they enforce the agreed-to rulebook of the HIO.[82]

93.     In 2011, there were 12 USDA-certified HIOs. They ranged in size from SHOW, which had 23 DQPs in 2010 to WHOA (Walking Horse Owners Association) with four. There were 119 DQPs with licenses recognized by the USDA. SHOW was the largest HIO, having been established in 2009 by the Board of Directors of the Tennessee Walking Horse National Celebration, which holds the largest event each year and selects the grand champions in each class. This yearly, eleven-day event sells nearly a quarter of a million tickets. The September 2011 competition awarded more than $650,000 in prizes. The seven member National Celebration board also sits as the board of directors of SHOW, Inc., a 501(c)(3) tax-exempt, not-for-profit corporation. SHOW is certified by the USDA to license DQPs. SHOW's President is a licensed veterinarian; SHOW employs a Secretary/Treasurer. Its 2011 operating budget was about $550,000, around $300,000 coming from the National Celebration and the rest coming from affiliation fees, day and annual cards and fines. In 2011 its day card for one show was $50.00, up from $25.00 in 2010, but an annual card could be purchased for $150, up from $100 in 2010.[83]

94.     At the 2009 National Celebration, DQPs working for SHOW issued tickets for 601 violations, which included 48 for bilateral, 305 for scar rule and 133 for unilateral violations. In 2010, SHOW issued 270 violations; 35 bilateral, 86 scar rule and 106 unilateral. Under SHOW's penalty matrix, the penalty for a bilateral sore is a one year

---

[82] Ex.A, 1Apx.31-32, ¶ 89.
[83] Ex.A, 1Apx.32, ¶ 90; Ex.74, 8Apx.1145-1149; Ex.75, and 8Apx.1150-1161.

suspension from events where SHOW is the HIO; for a unilateral sore violation or scar rule violation there is a $100 fine, but no suspension until the 3rd violation, due to the subjective aspect of the inspection process. [84]

95.    From all events where SHOW inspects entrants, only about three dozen appeals are filed each year.  The rest of those assessed a suspension accept the penalty.  One reason there are so few appeals is that suspensions are not the general rule.  But the number of appeals will increase under the new rule, because the suspension penalties are more severe than those in the present SHOW matrix.  For most violations, SHOW does not assess a suspension from its events, but under the new rule, suspensions are mandated for most violations, and the suspensions apply to all events nationwide.  In addition, the new rule increases the suspension for a second or subsequent offense, so those ticketed may be inclined to appeal a short suspension in order to avoid having a first offense on their record.[85]

96.    For a scar rule violation, of which SHOW DQPs detected 86 at the National Celebration in 2010 (41% of all violations), the SHOW penalty is a $100 dollar fine for the first three violations, and $100 and a two-week suspension for all subsequent violations, but only from SHOW exhibitions.  Under the new rule, the minimum penalty for scaring for the first offense is a two-week suspension, for the second offense a 60-day suspension, for subsequent violations a one-year suspension, and these are suspensions from all shows in the nation.[86]

97.    In 2010, at the major event in the country, 13% of the violations ticketed required a suspension under SHOW's matrix from those shows affiliated with SHOW.  Under the

---

[84] Ex.A, 1Apx.32, ¶ 91; Ex.76, 8Apx.1167; and Ex.77, 8Apx.1168-1170.
[85] Ex.A, 1Apx.32, ¶ 91.
[86] Ex.A, 1Apx.33, ¶ 93.

proposed regulation, 85% of those ticketed in 2010 would be subject to mandatory suspensions from all shows for some period.[87]

98.    For the year 2010, SHOW inspected 23,870 horses.   Pre-show inspections detected 238 unilateral and 119 scar rule infractions. These 357 tickets are not punished by suspensions at the present time under SHOW's rulebook matrix, but would be under the new rule.  In 2010 SHOW inspectors found 63 bilateral violations, which is a suspension offense under SHOW's rulebook, and from which almost all the 2010 appeals arose. About 50% to 60% of these tickets were appealed, giving rise to about 40 appeals for the year.  If 50% of the unilateral and scar rule tickets are appealed because of suspensions imposed under the new rule, this could result in about 200 appeals. The SHOW adjudication process would be overwhelmed and collapse.[88]

99.    The table below represents the number of unilateral, scar rule and bilateral violations ticketed by DQPs that are reported in the USDA reports for the years 2007 through October 2011.[89]

| YEAR | SCAR RULE | UNILATERAL | BILATERAL | TOTAL |
|------|-----------|------------|-----------|-------|
| 2007 | 193 | 154 | 27 | 374 |
| 2008 | 220 | 192 | 43 | 455 |
| 2009 | 301 | 238 | 70 | 609 |
| 2010 | 309 | 520 | 82 | 911 |
| 2011 | 269 | 500 | 60 | 829 |
| | 1,292 | 1,604 | 282 | 3,179 |

100.    In 2010, SHOW suspended 67 people, 13 for more than two weeks but less than one year, 25 for one year.  Based on the 2010 USDA report reflecting all HIO assessed suspensions, 27 people received suspensions of more than two weeks but less than a year. SHOW issued about 50% of these suspensions. In 2010, the total number of persons

---

[87] Ex.A, 1Apx.33, ¶ 93.
[88] Ex.A, 1Apx.33, ¶ 95.
[89] Ex.A, 1Apx.33-34, ¶ 96.

issued one-year suspensions was 27; SHOW's 25 one-year suspensions represents 93% of the one-year suspensions issued. In 2011, 18 one-year suspensions assessed by HIOs are listed on the USDA report. Of these, 15 were issued by SHOW or 83%. In 2009 and 2010, during the first two full years of SHOW's operations, SHOW issued 40 one-year suspensions.[90]

101.   If the new rule goes into effect, with the mandatory suspension penalties, which will apply to all shows, several prosecutors will have to be retained by the HIOs, along with hiring "court" personnel. Accused parties will hire lawyers. DQPs will have to be paid to prepare evidence and testify. Since the DQPs are not veterinarians, HIOs may have to hire veterinarians to check the DPQs' observations at the shows, just like the USDA does. Maybe the HIO will need two verification-veterinarians, like the USDA uses. Exhibitors might bring their own veterinarians to the shows to perform contesting exams. That this is already done is exemplified in a 2000 reported case, where the entrants had a veterinarian on site who contested the VMOs' opinions.[91]

102.   The new due process inspection and adjudicatory process will become very expensive for participants and HIOs. To pay for this, the show managers or HIOs will have to raise the money from fee charges to the participants. What is already an expensive hobby for most entrants will become prohibitively expensive. The USDA certification that the new rule will not increase costs to HIOs was not promulgated according to law in violation of APA §706(D).[92] The new rule is arbitrary, capricious, and an abuse of discretion because it will impose the expense of enforcing the HPA on private citizens, and thus violates APA §706(A), (B) and (C).

---

[90] Ex.A, 1Apx.34, ¶ 97.
[91] Ex.A, 1Apx.34, ¶ 99; Ex.54, 4Apx.554-557.
[92] Ex.A, 1Apx.34-35, ¶ 100.

**F.    THE NEW RULE IS ARBITRARY AND CAPRICIOUS BECAUSE IT EXPOSES DQPS, HIOS AND THEIR AGENTS TO CIVIL LIABILITY WITHOUT PROVIDING THEM GOVERNMENTAL OR OFFICIAL IMMUNITY.**

103.    The new rule is invalid because it arbitrarily exposes DQPs, HIOs and show management to civil liability, while denying them immunity from suit or liability for their actions in enforcing federal law, a fact acknowledge by the Department in the Supplemental Information section of the Final Rule. The new rule requires that private entity HIOs impose on HPA violators USDA-dictated mandatory suspensions.    The imposition of such a "sanction" pursuant to an agency regulation is an "agency action" under 5 USC §551(13). The new rule requires HIOs to adopt appeal procedures that must be approved by the Department. When the government penalizes a person, thereby depriving the person of property, that person must be afforded due process of law, as mandated by the Fifth Amendment to the U.S. Constitution.[93]    "It is axiomatic that the due process clause of the Fifth Amendment protects individuals against arbitrary deprivations of liberty or property by the federal government," the court of appeals held in a USDA suspension enforcement action under the HPA. *Fleming v. USDA*, 713 F. 3d 179, 183(6th Cir. 1983).

104.    Suspensions under an HIO appeal procedure will deny the accused the use of their property.  The penalties will be under federal law, and the accused must be afforded due process. When HIO agents, prosecutors and judges infringe on a person's property rights, they must do so according to the Fifth Amendment's requirement that they afford due process of law.  The failure to afford due process of law to one whose rights are infringed on can result in civil liability to the violator.  Such an action could be asserted in either state or federal court, under federal or state law.  HIOs and those representing them in

---

[93] Ex.A, 1Apx.40-41, ¶ 114-115.

such suits will not have the benefit of the doctrines of official immunity or prosecutorial immunity. *Richardson v. McKnight,* 521 U.S. 399 (1997).[94]

105.   The proposed regulation is unlawful because it arbitrarily exposes private actors to civil liability on the complaint they deprived a person of their property without affording due process of law, without providing the private actors with the defenses of governmental or official immunity.

## G.   THE NEW RULE WILL FRUSTRATE THE GOAL OF THE HPA, CONTRAVENING APA §706(A).

106.   The purpose of the 1976 HPA amendment, which resulted in the HIO/DQP program, was to encourage managers of events to adopt a system so that the industry would self-regulate by having private inspectors at shows performing inspections to enable management to know which horses to disqualify. The HPA does not authorize DQPs or HIOs to enforce the HPA by penalties of any kind. Management's incentive for using HIOs is that if it hires DQPs to inspect horses, then management will not be liable for civil or criminal penalties if a sore horse is exhibited, so long as it disqualifies horses so designated by the DQP or the USDA's VMO, if present. There are instances where DQPs passed a horse, and where after the event USDA VMOs found the horse should have been disqualified. But the show management was not found liable because it is immune from liability if it disqualifies the horses DQPs decide are sore. The increased cost of the HIO system will cause managers to drop the system rather than lose entrants.[95]

107.   Under the new rule, there will be a disincentive for participants to exhibit their horses in shows employing DQPs. The disincentive is that they must agree to the HIO's rules, which under the new rule will mandate far more severe penalties than in the past.

---

[94] Ex.A, 1Apx.41-42, ¶ 116-119.
[95] Ex.A, 1Apx.35, ¶ 101; Ex.32, 4Apx.554-557; Ex.33, 4Apx.558-568; Ex.34, 4Apx.569-572; Ex.41, 4Apx.604-613; Ex.42, 4Apx.614-619; Ex.46, 4Apx.645-650; Ex.69-70, 7Apx.1087-1110.

Given that all horses are inspected, and about 3% of the horses are found with some alleged problem, with the new rule's mandatory penalties of suspensions from all shows, there is a significant risk of serious punishment for even the most innocent or contestable infraction.[96]

108. There are at least 400 to 500 shows a year that are not HIO affiliated. Fewer than a dozen of these nonaffiliated shows are visited each year by APHIS investigators. There are no DQP inspections, no tickets, no suspensions and no fines at these nonaffiliated shows. If the new rule becomes effective, participants will find nonaffiliated events more attractive.[97]

109. Participants in shows with HIOs will be concerned about the lack of due process the HIO appeal procedures will provide. There will be particular concern about the lack of judicial independence the HIOs will have from the USDA. Participants will be disinclined to enter events with HIOs because they will not want to put their financial well-being at the mercy of individuals who may be competitors in the events, whose horses may be competitors in other events, and where, as the OIG Audit recognizes, conflicts of interest are always a concern.[98] Show managers will be disinclined to affiliate their shows with HIOs, since non-affiliated shows are not required now, or even under the new rule, to issue mandatory minimum suspensions or penalties.

110. Most importantly, HIOs like SHOW will probably cease operation, destroying the HIO/DQP system that Congress created as a system of industry self-regulation. Officers, directors, employees of HIOs will not want to participate in a system that will subject them to lawsuits with potentially ruinous consequences. SHOW cannot possibly prepare

---

[96] Ex.A, 1Apx.35, ¶ 102; Ex.79, 8Apx.1179, Ex.7, 2Apx.174.
[97] Ex.A, 1Apx.35-36, ¶ 102; Ex.79, 8Apx.1179; Ex.7, 2Apx.174.
[98] Ex.A, 1Apx.42, ¶ 120.

a due process appellate procedure and fund it by July 9, 2012. It will operate under its present rulebook until it is decertified. Other HIOs are probably in this same position. They do not have paid professional staff to administer due process appeal procedures, where the consequences are so severe to the accused. The HIO/DQP system will collapse.[99]

## VII.  RELIEF REQUESTED

111.    For all the reasons cited above, plaintiffs request that the court grant the following relief.

### A.    REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

112.    As illustrated above, Plaintiffs will suffer irreparable injury if Defendant is not enjoined during the pendency of this lawsuit from implementing the regulatory changes in the final rule. Plaintiff SHOW, Inc. cannot comply with the new rule and submit a compliant revised rulebook by July 7, 2012. As the largest HIO, it will lose its HIO certification. SHOW will not be able to meet the requirement that it adopt and implement an appeal procedure that affords the accused statutory and constitutional due process because it does not have the personnel to act as judges, staff and prosecutors, it does not have subpoena power or any other authority necessary to provide appellants due process, and it does not have the money to administer the appeal process where the consequences to the accused are so severe. Without providing due process to alleged violators, SHOW will be subject to lawsuits brought by individuals who will be suspended under the new rule. SHOW will lose its certification or incur the expense of trying to comply with the new rule. SHOW would not be able to recover the lost expenses of attempted compliance if the new rule is found invalid. The inability to recover money damages from the

---

[99] Ex.A, 1Apx.43, ¶ 121.

government is an irreparable harm. *R.J. Reynolds Tobacco Co. v. U.S. Food and Drug Admin.*, 823 F.Supp.2d 36 (D.D.C. 2011). Under these conditions, neither plaintiff McGartland nor SHOW can continue to participate in the HIO system, frustrating their desire to eliminate the soring of horses from the arena.[100]

113.   Plaintiffs McGartland and Contender Farms, LLP will be subject to suspensions from all shows if a horse they own or enter is identified as "sore." They do not sore horses. They would challenge any DQP's determination that their horse was sore. But, any HIO's remaining after the new rule goes into effect will not have appeal procedures that afford statutory and constitutional due process, if for no other reason than that the new rule precludes judicial review of HIO decisions. Any HIO that submits an appeal procedure that the USDA approves will be under the control of the USDA, lacks judicial independence, and will not have authority to interpret the law. These plaintiffs will be subject to disqualification from all shows based on a Department rule that is inconsistent with the HPA, not the least being the denial of the statutory right to have the Secretary enter a final order under §1825(b), the denial of the right to appeal to an Article III court and the exposure to multiple prosecutions and penalties by both an HIO and the USDA. Because HIOs will cease operations, the inability of plaintiffs and other owners in the industry to enter their horses in events where DQPs inspect all horses will cast a cloud over the industry because cheating will increase. Good horses, like those belonging to these plaintiffs, will decrease in value. Plaintiff McGartland will cease prosecuting for SHOW given the individual liability he will be exposed to by those who believe they have not received due process in the appeal.[101]

---

[100] Ex.A, 1Apx.43, ¶ 122.
[101] Ex.A, 1Apx.43-44, ¶ 123.

114.    As shown above, there is a substantial likelihood that plaintiffs will prevail on the merits, because the new rule, on its face and as it will be applied, violates the Administrative Procedures Act and the United States Constitution.[102]

115.    The harm faced by plaintiffs if the rule becomes effective outweighs any harm to defendant if the preliminary injunction is granted. There is no harm to the defendant by continuing to operate under the current regulations for the few months it will take to have a trial and final judgment. The USDA's proposed mandatory suspensions in 2009 and asked the HIOs to agree to impose them. For almost three years the Department threatened to promulgate mandatory minimum suspension rules. Even after formally proposing the rule in May 2011, it was not until a year later, in June 2012, that the new rule was adopted and announced. A delay in implementation of the new rule will not adversely affect the government.[103] The government's delay in implementing the rule proves that there is no injury to the government's or the public's interests. *See, R.J. Reynolds, supra.*

116.    Issuance of preliminary injunction will not adversely affect the public interest because the status quo is maintained by operating under the current regulations, and the USDA can continue to enforce the HPA. Furthermore, both the public and the government have an interest in not violating the Constitution, which the new rule does. *Id.* The delay will benefit horses and the horse industry, because DQP inspections will continue as they have since 1976. It is not a perfect system, but it is the only valid one that exists.[104]

---

[102] Ex.A, 1Apx.44, ¶ 124.
[103] Ex.A, 1Apx.44, ¶ 125.
[104] Ex.A, 1Apx.44, ¶ 126.

**B.** **PERMANENT INJUNCTION AND DECLARATORY RELIEF**

117. After a final hearing, plaintiffs request the court to enter a permanent injunction against the defendant, enjoining defendant from enforcing or implementing the new rule. Plaintiffs request the court declare the new rule invalid because it violates the Administrative Procedures Act §706 and the United States Constitution.

## VIII. <u>CONCLUSION</u>

118. Plaintiffs request the court issue a temporary restraining order to prevent the rule from going into effect on July 9, 2012, set plaintiffs' bond, and set a hearing for preliminary injunction at the earliest possible time. Plaintiffs further request that the court hold the new rule unlawful and set aside the USDA's action in adopting the new rule and permanently enjoin the Department from implementing it effective.

Respectfully submitted,

Karin Cagle
Texas State Bar No. 24043588
Kirkley & Berryman, L.L.P
100 N. Forest Park Blvd., Suite 220
Fort Worth, Texas 76102
E-mail:kcagle@kbblawyers.com
Tel. 817.335.3311
Fax: 817.335.3373

**David Broiles**
Texas State Bar No. 03054500
2400 Indian Cove
Fort Worth, Texas 76108
Email:pbroiles@yahoo.com
Tel. 817-246-7801

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I served this document on the Defendant, per the Federal Rules of Civil Procedure, as indicated below, on June 25, 2012.

Karin Cagle


United States Attorney's Office
801 Cherry Street, Suite 1700
Fort Worth, TX 76102-6897
Via hand-delivery

Attorney General of the United States
950 Pennsylvania Avenue, NW,
Washington DC 20530-0001
Via US Mail CRRR

and as a courtesy
Attorney General of the United States
Attention: Nate Swinton
20 Massachusetts Ave NW
Room 7206
Washington , D.C. 20001
Via FedEx
And via email, except for appendix
Nathan.M.Swinton@usdoj.gov
john.griffiths@usdoj.gov


U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250
Via US Mail CRRR

≉JS 44 (TXND Rev. 2/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
S.H.O.W., Inc., Contender Farms, LL P,
Mike McGartland

**(b)** County of Residence of First Listed Plaintiff  Bedford
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Karin Cagle, 100 N. Forest Park, Ste 220 Ft W 76110
David Broiles, 2400 Indian Cove, Ft. W 76108
KC 817-335-3311 ; DB 817-296-7801

## DEFENDANTS
United States
Department of Agriculture

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)  Nathan M. Swinton, U.S. A.G
20 Massachusettes Ave NW,
Room 7206, Washington DC 20001
email Nathan.M.Swinton@usdoj.gov

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☑ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|   | PTF | DEF |   | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
5 USC §706 ; US Constitution, art I, §1,8, art III ; 15 USC 1821 seq
Brief description of cause:
Suit to enjoin USDA from enacting invalid regulation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☑ No

## VIII. RELATED CASE(S) PENDING OR CLOSED: (See instructions)
JUDGE _____  DOCKET NUMBER _____

DATE  June 25, 2012
SIGNATURE OF ATTORNEY OF RECORD  Karin Cagle

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____