IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SHOW, INC., et al. | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-429-Y |
| | § | |
| UNITED STATES DEPARTMENT OF AGRICULTURE | § | |
| | § | |

MEMORANDUM OPINION REGARDING
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Before the Court is the motion for a temporary restraining order ("TRO") (doc. 1) filed by plaintiffs SHOW, Inc. ("SHOW"); Contender Farms, LLP ("Contender Farms"); and Mike McGartland. By the motion, Plaintiffs seek to enjoin the Animal and Plant Health Inspection Service ("APHIS"), an agency of the United States Department of Agriculture ("USDA"), from adopting and implementing a new rule, 9 C.F.R. § 11.25, effective July 9, 2012. Plaintiffs contend that § 11.25 violates the Horse Protection Act ("HPA"), 15 U.S.C.A. §§ 1821-1831 (West 2012); the Administrative Procedures Act ("APA"), 5 U.S.C. § 706 (West 2012); and the United States Constitution. As the Court announced in its July 6, 2012 Order Denying Motion for Temporary Restraining Order and Accelerating Trial on the Merits (doc. 17), the Court has determined that Plaintiffs' TRO motion should be denied.

I. Background

In 1970, Congress passed the HPA to eliminate and prevent the

"soring" of show horses.[1] Soring--a practice that Congress has found to be cruel and inhumane--involves harming the legs of a horse so that it will walk with an exaggerated gait. A superior gait is a desired characteristic in a show horse because it helps the horse to win competitions.

The HPA authorizes the USDA to designate persons to inspect horse shows and exhibitions for evidence of soring. *See* 15 U.S.C.A. § 1823(e). USDA inspectors known as veterinary medical officers ("VMOs") have been designated to fill this role. An individual who is found to have violated the HPA is subject to criminal and civil liability. *See id.* § 1825(a)-(b). In addition, the USDA is authorized to disqualify such an individual from participating in future horse shows and certain other events for at least one year for a first-time violation and five years for subsequent violations. *See id.* § 1825(c). The HPA sets out procedures to govern these types of disqualification actions. *See id.* § 1825(c)-(d).

In addition to providing for direct enforcement of the HPA by the USDA, Congress contemplated a method of private enforcement. As a general matter, under the HPA, the USDA "is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of [the HPA]." *Id.* § 1828. More particularly, the

---

[1] Congress amended the HPA in 1976. *See Stamper v. Sec'y of Agric.*, 722 F.2d 1483, 1488 (9th Cir. 1984).

HPA requires the USDA to promulgate regulations concerning the appointment "of persons qualified to detect and diagnose a horse which is sore or to otherwise inspect horses" and the manner of such inspections. *Id.* § 1823(c). These private inspectors are called designated qualified persons ("DQPs"), and they are certified and trained by private entities known as horse-industry organizations ("HIOs"). *See* 9 C.F.R. §§ 11.1, 11.7, 11.21.

Under the HPA, when the manager of a horse show affiliates with an HIO and hires DQPs to detect soring among the show's participants, the manager is not liable for any participants' being later found to have engaged in soring unless the manager received notice or gained knowledge that soring occurred. *See* 15 U.S.C.A. § 1824(5), (6). On the other hand, when a manager does not utilize DQPs, he is strictly liable if any of the show's participants are found to have engaged in soring. *See id.* § 1824(3), (4). HIOs are authorized to impose penalties against entrants whose horses are identified as sore. The USDA also may initiate an enforcement action against any person whose horse has been identified as sore by a DQP.

Prior to the effective date of the new § 11.25, an HIO determined what penalty to assess for a particular violation by consulting the penalty matrix set out in that HIO's rulebook. Similarly, an HIO determined its own procedure for administering appeals. But with the promulgation of § 11.25, a number of

requirements concerning HIO-affiliated events have changed, affecting HIOs as well as horse-show participants and sellers, among others. In light of this, Plaintiffs filed the instant lawsuit, along with a motion for a TRO, seeking to enjoin the USDA from adopting and implementing § 11.25.[2]

## II. Analysis

A TRO is an extraordinary form of relief and should only be granted upon the showing of four prerequisites:

> (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm for which the movant has no adequate remedy at law; (iii) that greater injury will result from denying the temporary restraining order than from its being granted; and (iv) that a temporary restraining order will not disserve the public interest.

*Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 607 (N.D. Tex. 2006) (Lindsay, J.) (citing *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987)). The third and fourth factors merge when the government is the party against whom the TRO is sought. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 256 (3d Cir. 2011).

### A. Likelihood of Success on the Merits

The newly promulgated § 11.25, in relevant part, identifies several violations of the HPA, provides that such violations shall

---

[2] SHOW is an HIO. Contender Farms is a limited-liability partnership that owns trains, shows, and sells show horses. And McGartland an owner and general partner of Contender Farms. McGartland owns and exhibits show horses, hires trainers, and serves as a volunteer prosecutor for SHOW.

result in suspension, and prescribes the minimum suspensions and penalties that must be assessed against those who commit such violations. *See* 9 C.F.R. § 11.25(b), (c). More importantly, at least for purposes of this case, it requires each HIO to enforce and include in its rulebook the aforementioned mandatory suspensions and penalties. *Id.* § 11.25(a). Each HIO must also "provide a process in its rulebook for alleged violators to appeal penalties," which "must be approved by [the USDA]." *Id.* § 11.25(e).

Plaintiffs advance several arguments challenging the lawfulness of these provisions under the HPA, APA, and U.S. Constitution. After an initial review of those arguments, it is the Court's position that, while Plaintiffs' have stated claims that are colorable, they have not established that their likelihood of success on the merits is **substantial**. *Clark*, 812 F.2d at 993.

Under the HPA, the secretary of the USDA "is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of [the HPA]." 15 U.S.C.A. § 1828. That is a rather broad grant of rule-making authority. And while the Court is committed to exploring further the merits of Plaintiffs' claims, the Court is not initially persuaded that Plaintiffs' claims under the HPA are substantially likely to prove meritorious, given the broad grant of rule-making authority conferred upon the USDA by § 1828.

And given the Court's initial position on Plaintiffs' HPA claims, the Court likewise concludes that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their APA claims. Under the APA, a court must "hold unlawful and set aside" a regulation promulgated by an agency that is (A) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (B) "contrary to constitutional right, power, privilege, or immunity"; (C) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (D) "without observance of procedure required by law." 5 U.S.C.A. § 706(2)(A)-(D). At this point, the Court is not persuaded that § 11.25 falls into one of these categories.

Lastly, the Court fails to see obvious merit in Plaintiffs' contention that § 11.25 offends the U.S. Constitution. Plaintiffs, in the Court's view, have not established a substantial likelihood of success on their claim that § 11.25's HIO-enforcement scheme invites an improper exercise of Article III judicial power or reflects an impermissible encroachment by the executive branch on Congress's Article I power to create inferior tribunals. Accordingly, the Court concludes that the likelihood-of-success factor weighs against the granting of a TRO.

B. Irreparable Harm

Plaintiffs contend that "SHOW will be unable to supply DQP's to its affiliated shows, whose management will thus be subject to

strict liability under the act, loss of a right under the HPA." (Pls.' Reply Br. 19.) In addition, Plaintiffs contend that SHOW will be decertified as an HIO. "These," according to Plaintiffs, "are losses that cannot be recouped." (*Id.*) In addition, Plaintiffs contend that Contender Farms and McGartland "will be denied HPA statutory due process rights," as well as constitutional due process, and will suffer "wrongful suspensions" and "extreme financial risk." (*Id.* at 20.)

Aside from the risk to SHOW of decertification, none of these risks appears to be so imminent that it will injure Plaintiffs before the Court has had a chance to resolve the merits of Plaintiffs' challenges to § 11.25. And as far as decertificaiton goes, the Court fails to see why SHOW, in the event of a successful outcome in the instant case, cannot simply re-apply for certification and seek recovery for any financial losses that it incurred as a result of decertification. In view of this, the Court concludes that the irreparable-harm factor counsels against granting a TRO and should be revisited in connection with Plaintiffs' request for a preliminary injunction.

C. Public Interest and Balance of Hardships

In the Court's view, it is in the best interests of the parties and the public that the Court reach a judicious ruling on the lawfulness of § 11.25 before granting the extraordinary remedy of a TRO. Most of Plaintiffs' public-interest concerns can be

satisfied, if proven successful, by a judgment at trial. Given Plaintiffs' insistence on the importance of the separation-of-powers doctrine, they surely understand the Court's hesitation to halt the executive branch from acting purportedly pursuant to a congressional delegation of authority.

III. Conclusion

Based on the foregoing, Plaintiffs' motion for a TRO is DENIED.

SIGNED July 10, 2012.

Terry R. Means

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE